MEMORANDUM OF DECISION
This is an action for the termination of parental rights of Christina C., the unmarried, biological mother of Noele C. The petition was originally initiated by the Department of Children and Families (DCF) on January 5, 1995, and subsequently withdrawn on June 16, 1995. On the latter date, Christina C. consented to the termination of her parental rights as to her son Joshua C. in the Willimantic Superior Court for Juvenile Matters. The petition CT Page 694-YYYYYY was refiled as to Noele on August 9, 1996. Christina executed a consent to the termination on February 7, 1996. A guardian ad litem was appointed for Christina on October 11, 1996, and she subsequently withdrew her consent on October 25, 1996. Noele's biological father, Joseph B., executed a consent to the termination of his parental rights on January 17, 1995.
A Motion to Amend the Termination Petition was filed on November 26, 1996 and granted by the court on December 9, 1996. The amended petition alleges (1) that the father has abandoned the child; (2) that the child has been found in a previous proceeding to have been neglected and uncared for and that the parents have failed to rehabilitate themselves; that the child has been denied by reason of acts of commission or omission the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being; there is no ongoing parent-child relationship between the father and the child as that concept is defined by Section 17a-112 of the General Statutes; and finally, that the foregoing reasons have existed for more than one year.
The trial of this case occurred over portions of three days on December 9, 13 and 17 1996. In the course of trial, the biological mother, the foster mother, two therapists for Noele, a clinical psychologist, and the DCF social worker testified. CT Page 694-ZZZZZZ Eleven exhibits were admitted into evidence including psychological reports, treatment records and social studies.
FACTUAL FINDINGS
The evidence revealed that Noele was born on March 19, 1987. She first came into foster care on a voluntary placement in August 1989. Since that time she has been back and forth between her mother, her maternal grandmother and various foster families. She has been with a total of eight (8) foster families and has not lived with her mother since August 1, 1991. Most recently, she has been living with the same foster family since December 2, 1993, except between May 25, 1995 and May 26, 1996, when she was hospitalized first at Newington Children's Hospital (5/25/95 — 7/18/95), then Brightside for Families and Children (7/18/95 — 6/26/96) and Natchaug Hospital (10/14/96 — 11/4/96) (Petitioner's Exhibit C).
On September 24, 1991, petitions of neglect were filed by the Department of Children and Families (hereinafter, "DCF"), in the Superior Court for Juvenile Matters in Willimantic, Connecticut, on behalf of Noele and her brother Joshua. The petition as to Noele alleged that she had been physically and sexually abused and that the mother's mental health issues interfered with her ability to care for Noele and keep her safe from harm. Noele was adjudicated as neglected and uncared for and committed to DCF on CT Page 694-AAAAAAA January 21, 1992. On August 21, 1993, the original commitment was extended for an additional eighteen (18) months. A further extension of eighteen (18) was granted effective February 21, 1995. Termination of Parental Rights petitions were filed to both Noele and Joshua on January 5, 1995. Christina consented to the termination of her parental rights as to Joshua on June 26, 1995. On January 17, 1996, Joseph B. voluntarily signed a consent form terminating his parental rights as to Noele. Both Noele and Joshua are currently placed with the same foster family.
Over the years, numerous services have been offered or suggested to Christina C. including family preservation, individual psychiatric or psychological counseling, family therapy and the Elmcrest Hospital Trauma Resolution Program. (Petitioner's Exhibits B-1 B-2.)
Christina C.
Christina was born on August 7, 1970 in Putnam, Connecticut. At age 2 1/2 years she was diagnosed as learning disabled. She was nonverbal until age 3 and not toilet trained until age 5. She received special education services in all the schools she attended. Christina has admitted to being sexually abused by her father from ages 6 to 15. The abuse consisted of fondling, digital and penile penetration. She has suffered various symptoms CT Page 694-BBBBBBB following the years of sexual abuse including flashbacks, insomnia, suicidal thoughts and anxiety. At age 14, her parents separated and she went to live with her father who continued to sexually abuse her. At 15, Christina reported his behavior to her mother, Grace C., who then assumed her care. Grace has reported that she had difficult managing Christina's aggressive behavior and has stated that she would "spank her until she was blue in the face." Christina was herself in foster care for a period of eight months while she was in the eighth grade following which she returned to her mother's care.
In 1986, after moving to Putnam with her mother, Christina met Joseph B, Noele's biological father. Christina was sixteen years old when Noele was born in March 1987. When Noele was two months old, mother ended her relationship with father. Noele's grandfather moved back into the home at this time and Grace C. reportedly told father that grandfather sexually abused Noele at age two months. Christina subsequently met Wayne G. who fathered Joshua who was born on August 6, 1990. Mother has stated that Wayne G. was abusive and an alcoholic and she ended the relationship while Joshua was an infant.
On August 1, 1991, Noele and Joshua were placed in foster care at Christina's request. DCF reported that mother said that she would kill Noele if she were not placed. Grace C. informed DCF that Christina had major mental health problems that CT Page 694-CCCCCCC interfered with her ability to care for the children, that she did not bother with them, that she would sometimes visit graveyards and speak with spirits and hide in her closet and listen to the radio. On September 5, 1991, Christina withdrew her voluntary placement of the children and placed them in the care of Grace C. After grandmother was found to have a convicted child molester living in her house and to have imposed inappropriate forms of physical discipline, Noele was removed from that home and again placed in foster care.
Dr. David Mantell, a licensed clinical psychologist was appointed by the court to do four separate evaluations involving Christina, Noele and other family members. These evaluations were done on 12/2/91, 2/7/92, 7/15/93 and 3/9/95. His findings are set forth in Petitioner's Exhibits A-1, A-2, A-3 and A-4, respectively. Dr. Mantell also testified as to his findings at trial. In 1991, Dr. Mantell found that Christina was highly pathological and personality disordered, that she told him that she attempted suicide 15 to 20 times, that she was violent, had been raped beginning at age 7, had special powers that involved conversations with at least five dead people as well as delusions and hallucinations. He found Christina had been chronically abused yet was pathologically dependent on memories of her mother and father. He also found that Christina was severely damaged characterologically, did not show understanding of Noele's CT Page 694-DDDDDDD specialized needs, that all though she has made efforts to change things and has sometimes been compliant with expectations and visitation, these efforts fall off over time and are not sustained. In the course of her evaluations, mother showed no insight into her own family history or her need for parenting training or ongoing therapy. Dr. Mantell noted that even Noele expressed no confidence that her mother could take care of her. Finally, he believes that Noele's case is one of parental incompetence and does not think Christina will be able to care for children in the foreseeable future. Based on his findings, Dr Mantell concluded that mother is simply unable to properly care for children, that the Noele and Joshua had fallen victim to repeated abuse while in her care and that she never meaningfully engaged in treatment of her mental health issues from 1991 to 1995.
Jennifer Letendere, a DCF social worker has been assigned to Noele and Joshua since November 1994. She testified that Christina was fairly consistent with visitation until Noele's admission to Newington Children's Hospital in May 1995, and remained inconsistent during Noele's stay at Brightside from 7/18/95 to 6/26/96. A detailed history of mother's visitation with Noele is set forth on pages 12-15 of Petitioner's Exhibit B-2. After Christina agreed to termination in February 1996, visitation was reduced to once a month. While Christina consented CT Page 694-EEEEEEE to the termination of her parental rights as to Joshua on June 16, 1995, DCF withdrew its petition as to Noele on that same date because Noele had been hospitalized for psychiatric reasons and it was unclear whether or not she could return to a home environment. Christina did not prepare Joshua for termination. Around this time Christina's involvement with therapy also became inconsistent and she was ultimately terminated from treatment because she simply stopped going after a July 11, 1995 appointment. Although she indicated that she was planning to begin treatment with Dr. Epstein in Putnam, Connecticut, Christina apparently failed to do so and has stated that she does not think she needed it. Since 1995, the only individual counseling Christina has sought has been pastoral counseling through her involvement with the Jehovah's Witnesses.
Jean Barr is a psychotherapist at Brightside for Families and Children in West Springfield, Massachusetts, who worked with Noele during her entire stay from July 18, 1995 until June 26, 1996. She testified that she saw Noele three to four times a week for post traumatic stress syndrome and conduct disorder derived from her history of sexual abuse. Along with DCF, Brightside developed a six month plan that provided for Christina to telephone Noele six times a week using their toll free number and attend family therapy sessions two times a month. Transportation was provided to Christina by DCF and Brightside. The purpose of CT Page 694-FFFFFFF the plan was to allow Christina six months to consistently demonstrate that she could follow through with the conditions established working toward reunification. Mother called a total of eight times during Noele's entire eleven month stay. She attended three family therapy sessions out of a possible twelve. Christina was also supposed to attend weekly individual therapy sessions with Barbara Canning of United Services. (See Petitioner's Exhibit B-2 at 4.)
When Christina did attend family therapy at Brightside, she was looking for support and forgiveness from Noele. Although Jean Barr gave her guidelines as to how she was to address issues with Noele during the sessions, Christina did not respond to the guidelines. Noele's negative behaviors would escalate following the family therapy sessions. In February 1996, at a treatment plan meeting, Christina spontaneously announced that she was going to terminate her parental rights. When she came to tell Noele about the plan and became visibly upset, Noele held it together and comforted her. After Noele accepted that Christina was going to terminate her parental rights, Noele's behavior improved. Jean Barr further testified that Noele's special needs require that her caretaker be consistent, empathetic to her issues and background, be able to set strong limits and support, and demonstrate love, trust and nurturing. Christina cannot provide this because she is inconsistent in her efforts. Although CT Page 694-GGGGGGG she is empathetic, she does not appear to understand the extent to which Noele's behavior is the result of past trauma. When Noele acted up during family sessions, Christina did not take the initiative to set limits. Because she was unable to follow through with treatment recommendations and rehabilitation efforts, Brightside ultimately determined that Noele's reunification with Christina would be detrimental to Noele's emotional and physical well-being.
Christina testified that she would like to be able to visit Noele because she wants to know what is going on with her. At the point in time that she signed the consent form, she thought she would be able to continue to visit her or she would not have signed it. She wants things to be settled for Noele and would support adoption if it is in her best interest but she wants to be able to visit.
Noele
Noele is currently nine years old. She was originally placed with her current foster family on December 2, 1993. She is described as a bright, attractive child who has been in a total seven other foster homes, two hospitalizations and one residential placement. The reason she has been moved so many times is due to persistent aggressive, assaultive and destructive CT Page 694-HHHHHHH behavior. Her current foster family has been extensively involved in her treatment at Newington Children's Hospital, Brightside and Natchaug. They have participated in family therapy sessions and have facilitated visitation between Noele and Christina.
Noele has been victimized and traumatized almost since birth. She was reportedly sexually abused by her maternal grandfather when she was two months old. In 1989, at age two, she was sexually abused by her mother's live-in boyfriend who lived with them from April until August that year and had a history of sexually molesting young children. In November 1989, Grace C., maternal grandmother and a nurse a Day Kimball Hospital reported that Noele had been sexually abused by a man named "Tom." It has also been reported that Joshua's biological father was physically abusive to Noele and Christina. There have also been reports from 1991 that mother and grandmother physically disciplined Noele and that a male babysitter sexually abused her. In 1992, Noele was removed from her grandmother's home when it was discovered that grandmother had a convicted sex offender living with her.
Noele is currently treating with Rebecca B, a child and family therapist from Northeast Clinical Specialists in Willimantic, Connecticut, who specializes in treating child and adolescent sex offenders and victims. She testified that Noele is sexually reactive and so she considers her both a victim as well CT Page 694-IIIIIII as an abuser. She has seen Noele in group therapy and has recently begun seeing her in individual therapy. Her diagnosis is post traumatic stress disorder and conduct disorder. She has found that Noele has had no permanency or stability in her life, has attachment problems, boundary problems and her psyche has been damaged. She further testified that she does not attribute Noele's October 1996 hospitalization to anything that the current foster family has done and expects that as she goes through other transitions in life she may require further hospitalization. Although she is sad about it, Noele seems to understand that she cannot live with her mother because mother cannot take care of her. Noele seems to be developing a sense of permanency with her foster family. She needs stability, patience, flexibility, strong limits and boundaries and permanency. Noele needs to know that she will not be moved and no matter what she will be loved.
Cindy F. is Noele's foster mother. In addition to Joshua and Noele, she has a step-son, age 13. She has taken care of twelve children over three years. She has worked with people who have mental or behavioral disabilities as well as children with special needs. Her husband, Doug F., has worked for the Department of Mental Health and Department of Mental Retardation and now is a special education teacher. When Noele first came to live with them she was very difficult. She would swear, openly masturbate, hide things like kitchen utensils, bite, sexually act CT Page 694-JJJJJJJ out with other children, damage windows and other property. She would try to kick out windows in the car; she threw chairs around at school; she would run out of the classroom, she would take her shoes off in the van and throw them at the driver. Cindy describes Noele as a very bright child who identified with her misbehavior, engaged in a lot of limit testing and was very difficult to contain. She had nightmares every single night for four or five months. They stopped for awhile. She also had trouble sleeping at Brightside. When she came home, the nightmares began again. She dreams someone is breaking into her room and trying to steal her. She has had suicidal and assaultive behaviors that required emergency treatment and hospitalization. Cindy and Doug visited Noele at Newington Children's Hospital as often as was permitted. They live in Plainfield yet attended family therapy once a week at Brightside in West Springfield and brought her home on weekends thus making the 300 mile round trip three times each week.
Since Noele was discharged from Brightside, her behavior has improved. There has been no aggression toward the foster parents or other children except her brother; there is much less property damage; no acting out in the car. Noele is angry that she was not kept safe from sexual abuse in the past since it makes her feel like a bad person. Christina's inconsistency about visits has been very upsetting to Nicole. The last visit was in July 1996. CT Page 694-KKKKKKK Christina told Nicole she was planning to move to Maine with her boyfriend. Nicole started acting out after that because she was afraid her mother would forget about her. She also feared that Christina might get pregnant. In fact, Christina thought she might be pregnant. Cindy asked Christina to go for a pregnancy test so they could plan how to tell Noele. Despite Cindy's request and Christina's knowledge that the question of a possible pregnancy was a big issue for Noele, she did not get tested until October 1996. Visits with Noele were put off pending the termination hearing and because Christina thought she might be pregnant. Although Christina was supposed to call Noele weekly during this time, she missed one-half of the calls between July and October 1996. Noele is aware of the termination petition and is sad about it. She says maybe when she is sixteen, she will be able to visit her mom and keep herself safe. She knows her mom cannot keep her safe. Noele is just beginning to feel okay about being a victim and to be angry about what has happened to her. Noele calls both Christina and Cindy, mom, and Doug, dad. Cindy believes Noele knows that she and Doug love her and will keep her safe. If the termination petition is granted, they are considering adopting her and Joshua but they know they need respite because she is very demanding. They fully expect more hospitalizations. If they do adopt, they will allow visitation with Christina if the therapist says it is in Noele's best interest. CT Page 694-LLLLLLL
In his April 4, 1995 report (Petitioner's Exhibit A-4), Dr. Mantell writes that both Noele and Joshua present with substantial histories of emotional and behavior disorder as well as socialization difficulty. They are both behavior management problems and show the effects of repeated dislocation, abuse and neglect. Mother is not capable of setting expectations appropriate for the children's age and ability. "There is strong concern about the ability of the mother to adequately protect the children from harm. . . . At this point, I do not find evidence of the mother's ability to resume a responsible position in the lives of her children within a reasonable period of time. . . . The children have been in foster care long enough. The mother had ample opportunity to recognize and correct her difficulties. . . . I fear the children are too damaged and would present too great a parenting challenge for her." He also reports that Noele knows that her mother cannot take of her and believes that removing her from this foster family or not allowing her to be adopted would be catastrophic. Finally, Dr. Mantell advocates open adoption. This way she will never have to feel her mother doesn't love her and they can maintain a relationship.
Natchaug Hospital reports that, "[t]he basis of her [Noele's] aggression appears to be the anxiety and frustration created by the lack of predictability in her biological mother's behaviors. CT Page 694-MMMMMMM She is clearly capable of articulating these concerns and disappointments and has done so in treatment." A report dated October 31, 1996, further states in pertinent part:
 The child states that she does feel safe and cared for in her present foster home setting and is motivated to learn more effective coping skills. However, given the ambiguity of the present situation regarding her biological mother and the apparent connection between her aggression and mother's inconsistency, the treatment team at Natchaug Hospital has found it clinically necessary to disallow any contact between Noele and her biological mother during her period of stabilization and evaluation on the inpatient unit. Further, the treatment team recommends in the best interests of Noele to continue no contact with biological mother until issues surrounding termination of parental rights are resolved by the courts in December, 1996. (Petitioner's Exhibit E.)
 ADJUDICATION
 Reasonable efforts. The court finds from the foregoing facts by clear and convincing evidence that DCF has made reasonable efforts to reunify Noele with her mother, that the father was unwilling or unable to benefit from reunification efforts and CT Page 694-NNNNNNN that termination of their parental rights is in the best interest of the child. The court makes the following further findings:
Failure to Rehabilitate. Noele has previously been adjudicated a neglected child. Since the adjudication of neglect, the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, she could assume a responsible position in the life of Noele, in violation of Section 17a-112 (b)(2) of the General Statutes. The neglect petition was adjudicated on January 21, 1992 and Noele was originally committed to DCF on that date. Expectations were agreed to and signed at that time (Petitioner's Exhibit D). Included within the expectations were mother's agreement to visit the child as often as DCF permits and to participate in individual counseling. Mother's visitation with Noele particularly since May 1995 has been inconsistent even though she has been fully advised how upsetting and disruptive her lack of consistency is to Noele. In addition, mother has never engaged in meaningful or sufficient therapy in an effort to address her serious and persistent mental health issues and major parenting deficiencies. (See Petitioner's Exhibits A-1, A-2, A-3 and A-4.)
Acts of commission and omission. The court also finds by CT Page 694-OOOOOOO clear and convincing evidence that Noele has been denied, by reason of acts of commission and omission by the mother, the care, guidance or control necessary for her physical and emotional well-being in violation of Section 17a-112(b)(3) of the General Statutes. The testimonial and documentary evidence is replete with examples of mother's repeated failure to keep Noele safe from both physical and sexual abuse while in her care as well her total inability to parent this child to any degree by caring for her or even visiting her on a consistent basis, nurturing her, setting limits, and providing her a stable living environment.
Finally, the court finds that both the foregoing grounds have existed for more than one year.
The father, Joseph B., has previously signed a consent to terminate his parental rights which the court accepts as voluntarily and knowingly made.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine pursuant to Section 17a-112
(d), as amended, if a termination of parental rights is in the best interest of the child. Practice Book Section 1050.1(3). In CT Page 694-PPPPPPP so doing, the court must consider the following statutory criteria:
1) Regarding the nature and timeliness of services offered by DCF, the court finds that appropriate, timely services were offered or provided in an effort to facilitate reunion of Noele with her mother including family preservation services, individual psychological counseling at United Services in Dayville, Catholic Charities in Norwich and Day Kimball Hospital outpatient psychiatric services in Putnam, parenting classes, trauma resolution counseling, and family counseling at Brightside for Children and Families. As to the biological father, Joseph B, the court finds by clear and convincing evidence that he was unable or unwilling to benefit from reunification efforts.
2) Regarding the efforts of reunification pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, the court finds by clear and convincing evidence that DCF has made reasonable efforts, given all the circumstances to reunite Noele with her family. In addition to the services that were offered or provided as set forth in paragraph (1) above, DCF offered visitation since 1991 and visitation and transportation assistance.
3) Regarding court ordered expectations, expectations were CT Page 694-QQQQQQQ agreed to and signed on January 21, 1992, the date of Noele's original commitment (Petitioner's Exhibit D). Included within the expectations were for mother to visit the child as often as DCF permits and to participate in individual counseling. Mother's visitation with Noele particularly since May 1995 has been inconsistent even though she has been fully advised how upsetting and disruptive her lack of consistency is to Noele. In addition, mother has never engaged in meaningful or sufficient therapy in an effort to address her serious and persistent mental health issues and major parenting deficiencies (Petitioner's Exhibits A-1, A-2, A-3 and A-4).
4) Dr. Mantell, the psychological evaluator, Jean Barr, the psychotherapist from Brightside, Rebecca B, Noele's treating therapist, Jennifer Letendere, the DCF treatment worker, and Cindy F., the foster mother, all testified that while Noele misses her mother and would like to have an ongoing relationship with her, the stronger bond is between Noele and Doug and Cindy F. with whom she and her brother have lived since December 1993, and who have become her psychological parents. DCF and the foster parents have agreed to an open adoption of Noele as long it serves her therapeutic needs. (See Petitioner's Exhibit F.) The court finds that adoption by the foster parents would provide Noele the love, consistency, safety and stability that she desperately needs and which her mother is so incapable of CT Page 694-RRRRRRR providing.
5) Noele will be ten (10) years on March 19, 1997. Until December 1993, she had been in seven foster placements. She requires a permanent home where she will be safe from physical and sexual abuse and which provides patience, acceptance, understanding and structure. The child's attorney recommends termination.
6) Mother has made an inconsistent and overall poor effort to adjust her circumstances, conduct and conditions of her life so that in it not in the best interest of Noele to ever return to her care. Christina was never able to provide appropriate care for her children because of her own history of sexual abuse and mental health issues which are detailed in Dr. Mantell's evaluations, Petitioner's Exhibits A-1, A-2, A-3 and A-4. Although she has maintained contact with Noele and Cindy F., as well as visitation, Christina has never mounted a consistent effort to regain the custody of Noele. Her guardian ad litem recommends termination. Giving her additional time would not likely bring her performance as a parent within acceptable standards sufficient to make it in the best interest of the child to be reunited.
7) The only one who has prevented mother from maintaining a CT Page 694-SSSSSSS more meaningful relationship with Noele is Cristina herself. DCF has made significant efforts to assist her toward achieving reunification but her own disabilities and personal failings have prevented her from reaching this goal.
ORDER
Having weighed all statutory considerations, the testimony and evidence presented, a having found by clear and convincing evidence that grounds exist for termination of parental rights, the court further finds upon all the facts and circumstances presented that it is in the child's best interest to terminate the parental rights of Joseph B., by his consent, and to terminate the parental rights of Christina C. for the reasons previously expressed. This finding is made after considering the child's sense of time, her need for a secure and permanent environment, her relationship with her foster parents and the totality of the circumstances.
Accordingly, it is hereby ordered that the parental rights of Joseph B. and Christina C. in and to Noele a/k/a Noell C. are hereby terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for the purpose of placing Noel forthwith in adoption and to report to this court in writing as to the CT Page 694-TTTTTTT progress toward that end no later than ninety (90) days from the date of this judgment. The court has heard with approval testimony that the present foster family has a strong interest in adopting Noele and Joshua. If for any reason this plan for adoption does not occur, the Department of Children and Families shall make this fact known to the court promptly in writing and the case shall be having found by clear and convincing evidence that grounds exist for termination of parental rights, the court further finds upon all the facts and circumstances presented that it is in the child's best interest to terminate the parental rights of Joseph B., by his consent, and to terminate the parental rights of Christina C. for the reasons previously expressed. This finding is made after considering the child's sense of time, her need for a secure and permanent environment, her relationship with her foster parents and the totality of the circumstances.
Accordingly, it is hereby ordered that the parental rights of Joseph B. and Christina C. in and to Noele a/k/a Noell C. are hereby terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for the purpose of placing Noel forthwith in adoption and to report to this court in writing as to the progress toward that end no later than ninety (90) days from the date of this judgment. The court has heard with approval CT Page 694-UUUUUUU testimony that the present foster family has a strong interest in adopting Noele and Joshua. If for any reason this plan for adoption does not occur, the Department of Children and Families shall make this fact known to the court promptly in writing and the case shall be scheduled for an immediate in court review. If adoption has not been finalized within six months from the date of the judgment, the Commissioner is further ordered to submit a Motion for Review of Plan for Terminated Child no later than that date to ensure compliance with federal and/or state law.
Peck, J.